# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TRACEY RODRIGUEZ a/k/a CAMARA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-184ML |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

This matter is before the Court on the Motion of Plaintiff Tracey Rodriguez for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff contends that the Administrative Law Judge ("ALJ") committed reversible error by failing to obtain an updated psychiatric/psychological expert opinion on the issue of Step Three equivalence and by relying on several mistakes of fact in concluding at Step Three that Plaintiff's mental impairments result in moderate limitations. Defendant Carolyn W. Colvin ("Defendant") has filed a Motion for an order affirming the Commissioner's decision. This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find neither legal error nor factual mistake. Accordingly, I recommend that Plaintiff's Motion to Reverse without or, Alternatively, with a Remand for a Rehearing of the Commissioner's Final Decision (ECF No. 7) be DENIED and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 9) be GRANTED.

# I.  Background

## A.  Introduction

Plaintiff was 34 years old at the alleged onset of disability on October 20, 2009, and remains insured for the purposes of the Title II disability program through the end of 2015.  Tr. 17, 114.  Her physical ailments include both severe impairments (cervical and lumbar degenerative disc disease) and non-severe conditions; ultimately, the ALJ found that these do not cause disabling limitations.  Tr. 18-19, 27.  Plaintiff does not challenge this determination. Rather, the case is focused exclusively on Plaintiff's mental health.  She has an array of diagnoses: bipolar disorder, intermittent explosive disorder with histrionic personality, anxiety disorder and panic disorder diagnosed by treating psychiatrist Dr. D. Kroessler, Tr. 991-95; depressive disorder, recurrent, moderate with violent component, diagnosed by treating primary care physician Dr. Emma Simmons of Family Care Center, Tr. 424; and depression, panic disorder with agoraphobia, bipolar disorder, post-traumatic stress disorder, substance abuse mood disorder, alcohol abuse and history of cocaine abuse, diagnosed by state agency psychologists Dr. Luz Teixeira and Dr. Sol Pittenger.  Tr. 398, 596.  At issue is the ALJ's Step Three finding that, although Plaintiff suffers from severe mental impairments, none meets or equals any Listing in severity.  Tr. 18.

Prior to onset in October 2009, Plaintiff had earned her GED and worked consistently as a receptionist, security guard, legal secretary and, most recently, as a technician putting in more than forty hours per week on fire alarm installations, a job she held from early 2008 until May 2010.  Tr. 84, 108, 296, 303, 309.  Shortly after she started as a technician in March 2008, Dr. Simmons noted that she was not experiencing stress or depression (although she still was having panic/anxiety attacks) and that she "[i]s becoming more antisocial so her new job is working well

2

for her." Tr. 501. In 2008, she earned $42,341.99 and, in 2009, she earned $36,186.85 even though she stopped work in November due to pain and weakness in her legs. Tr. 83, 274. She returned to work in January 2010 and worked until May, earning $18,250.79; she stopped working again based on doctor's orders because of the same physical issues. Tr. 84, 86, 274.

The record does not consistently evidence that Plaintiff's mental health issues interfered significantly with her ability to work at the jobs she held until May 2010. For example, in the function report initially filed in connection with these applications, she indicated that she was never fired or laid off from a job because of problems getting along with other people. Tr. 319-20. Inconsistently, after her claims were denied initially, she submitted a new function report; this time she answered the same question in the affirmative, stating that she had been fired or laid off because of "flippin out on bosses." However, she refused to answer the next question, which asked her to name the employer, writing simply, "rather not." Tr. 336. She also provided inconsistent information on this point in her two clinical interviews with state agency psychologists. She told Dr. Luz Teixeira that she "stopped working since in May 2010, because of her physical problems, and mental issues including anger management and panic attacks," but told Dr. Sol Pittenger that she "stopped working due to physical pain." Tr. 595. Finally, at the hearing, on examination by her attorney, Plaintiff testified that she stopped work for both physical and other reasons. Tr. 96. This answer contrasts with other hearing testimony such as when, in response to the ALJ's questions, Plaintiff testified that she stopped working on doctor's order based on the physical condition that was causing her to fall and be unable to hold up the work equipment. Tr. 85-87; see also Tr. 107 (although she has "gotten problems from, like, almost every job I had, . . . I still got good references from them").

Until she was forced to stop in May 2010, Plaintiff enjoyed working and seemed to do well in a position that called for toughness and technical expertise but not the ability to get along with others.  In September 2009, she was promoted to head sprinkler and fire tech.  Tr. 481, 594. Because she "can't work with people," she worked "by [her]self" and had her own "work truck." Tr. 92.  While she claimed that her dislike of people caused her to "throw wrenches at [her] workers," Tr. 92, it is also clear that she was well regarded for her technical skill.  At the hearing, she explained: "when I flipped out and snapped I was the only female of all the technicians.  I was one of the guys.  I had my own vehicle . . . I got away with it because they knew about better; I was one of the better technicians."  Tr. 96-98.  Her employer held the job for her for almost a year, until March 2011, when she was fired "because did not have paperwork" and "[c]an't complete the job safely."  Tr. 85, 760.

Throughout the period of alleged disability, Plaintiff repeatedly reported to health care providers that she was "homeless."  See, e.g., Tr. 396, 423.  As clarified in her testimony at the hearing, she had no fixed home of her own, instead living with various family members and friends, including with her mother, the father of two of her children, her grandmother, her husband, her friend Eddie and once in her car.  Tr. 82-83.  Plaintiff claims, "I hate everybody and I can't be around people because anxity [sic] I might hurt them . . . .  I'm angry all the time, short fused and I [sic] afraid I might snap and beat someone."  Tr. 318-19.  Nevertheless, although she reported rebelliousness as a child ("I hit teachers, I hit the principal, I was a bully"), she denies that she received special educational programming related to behavioral issues.  Tr. 592. Similarly, as an adult, Plaintiff has no history of criminal charges, convictions or arrests despite threatening behavior and homicidal (and suicidal) ideation.  Tr. 20, 397.

### B.     Mental Health History

In September 2009, one month prior to onset, Plaintiff saw her primary care physician, Dr. Simmons, for a check-up; the treating notes reflect that she was recently promoted at work and, while she had a long list of physical complaints, nothing serious was identified.  Tr. 481-84.  Then, in November 2009, Plaintiff began having trouble walking – "[l]egs just completely give out."  Tr. 479.  She fell several times; as a result she stopped working.  Tr. 477-79.  At her January 13, 2010, appointment, Dr. Simmons diagnosed "depressive disorder recur moderate/with violent component" and referred Plaintiff to "psych," noting that she is "[n]ot actively depressed right now but may be a large psychological component to some of her symptoms."  Tr. 477-78.  However, a week later, Dr. Simmons noted that Plaintiff was back to work – "[w]orking now and not falling.  Working full day and doing what she is capable of doing."  Tr. 475.  These notes reflect an appointment with the psychiatrist, Dr. Kroessler, in February 2010; however, there is no record that Plaintiff ever saw Dr. Kroessler or any other psychiatrist or psychologist for mental health treatment during 2010.  Id.

In May 2010, Plaintiff showed up at the Milford Regional Medical Center emergency department complaining she could not walk due to numbness and weakness in her legs.  Tr. 612.  When told that she would have to be admitted because she was not ambulatory, Plaintiff became agitated, had to be restrained from removing her IV, refused further treatment and left the hospital against medical advice.  Tr. 612-13.  To the shock of hospital staff, to whom she had just reported "numbness making it impossible for her to walk," "[s]he got dressed and briskly walked out of ED without discharge instructions.  She ambulated without difficulty."  Id.  At her follow-up appointment with Family Care Center, she reported that she did not stay at Milford due to "overwhelming stress" and that she is "an emotional wreck at work."  Tr. 791.  In June 2010, she

became angry at the Center for Orthopaedics, Inc., when she appeared for an appointment without the required co-payment and the staff insisted on payment. She was "yelling she needs her script [for Oxycodone] . . . offered payment plan refused stated will call wants to change doctors." Tr. 378. Similarly, in February 2011, her primary care physician refused to allow her to return to work; she became "very angry and agitated . . . [u]sing profanity and talking loudly and not able to be redirected." Tr. 436. When advised to see a psychiatrist, she "[l]eft the office and refused to talk any more." Id. The physician "[f]ollowed [her] to parking lot to assure that she was safe to herself and others." Id.

The first record evidence of mental health treatment[1] other than by her primary care physician appears in January 2011, when Plaintiff was seen at Gateway Healthcare, Inc. Tr. 417-23. This note indicates that it reflects her third visit, although there are no prior records. Tr. 420. At the appointment, the counselor observed that "[s]he has all the symptoms of a mood disorder . . . she is not functioning at this time due to her symptoms and her circumstances . . . [and] [s]he is a cooperative client but also explosive by history, she is very overwhelmed and cries through-out her sessions." Id. The counselor diagnosed moderate depression, serious anxiety, mild psychosis, mild suicidal ideation and moderate homicidal ideation and recommended that Plaintiff be seen by a clinician and case worker. Id. Plaintiff canceled her next appointment due to snow and did not return until June 2011.

Meanwhile, in March 2011, Plaintiff's primary care physician referred her to the Memorial Hospital emergency room based on complaints of suicidal ideation and of having chased her children's father (with whom she was staying) with a knife. She told hospital staff that she had experienced suicidal episodes since the age of eleven. Tr. 402-03. The physician

---

[1] In addition to the mental health treatment during the relevant period, the records refers to a hospitalization at Butler Hospital, a psychiatric facility, for post-partum depression after the birth of a child in 1994, as well as to treatment at Bradley Hospital, a psychiatric hospital for children. See, e.g., Tr. 420, 423.

assessment states: "Pt becoming agitated, violent. Her mother is here. Pt does not want to wait to talk to Gateway. Her mother will take her to another hospital. Pt denies SI/HI. Will leave [against medical advice] with mom." Tr. 404. Plaintiff left and apparently did not go to another hospital. She next sought treatment in April 2011, when she returned to the emergency room of Miriam Hospital for mild chest pain, which she thought might be a heart attack or a panic attack; on assessment, it was noted that she had no suicidal thoughts, no self-inflicted injuries, no symptoms of depression, bipolar or substance abuse and no feelings of hopelessness, helplessness or worthlessness. Tr. 861-62. In May 2011, she told Dr. Simmons that she was irritable but had no plans to hurt herself or anyone else; she reported having a new boyfriend, who "encourages her to get psych help." Tr. 754. She finally returned to Gateway for counseling in June 2011, when she filled in a screening form indicating that she was very depressed and experiencing panic attacks, but was not homicidal or suicidal. Tr. 422-23. As in early 2011, she appeared for one Gateway appointment, canceled the next due to illness and did not return until 2012. Tr. 417-18.

On February 1, 2012, Plaintiff finally was seen by the psychiatrist, Dr. Kroessler. Tr. 996. His notes for her initial visit reflect possible diagnoses of "PTSD, bipolar and panic c̄ [intermittent explosive disorder];" he prescribed lithium and asked her to return in one week. Tr. 996. At the next appointment, he noted "bipolar disorder vs IED (intermittent explosive disorder) c̄ histrionic [personality disorder]." Tr. 995. At the February and March appointments, Plaintiff was feeling better, with good sleep and energy, increased motivation, less avoidance, fewer racing thoughts, not depressed and having occasional good days, but still occasional anxiety and outbursts. Tr. 993-94. At the June appointment, Dr. Kroessler noted "not disabled," despite anxiety, insomnia and irritability; the irritability and insomnia continued in August 2012.

Tr. 991-92. Also during April through July 2012, Plaintiff was getting counseling at Gateway focused primarily on her failing marriage and childhood sexual abuse. Tr. 971-90. The counselor assessed her as participating well with no imminent risk factors present, including no depression, anxiety, psychosis, mania, or suicidal or homicidal ideation. Tr. 977, 987, 990.

### C.    Mental Health Opinion Evidence

Shortly after Plaintiff filed her disability applications, in November 2010, she was referred for a consultative psychiatric examination to be performed by state agency psychologist Dr. Luz Teixeira. See Tr. 395-99. Based on an interview during which they developed an adequate rapport, Dr. Teixeira noted that Plaintiff was not in treatment at the time of the examination, although she had been prescribed antidepressant medication by her primary care physician and was taking a psychiatric medication prescribed by her neurologist. Tr. 395-96. While she reported a history of substance abuse, she had not used drugs in a year and a half and denied alcohol abuse. Tr. 396. Despite her struggle with anger management, she denied any criminal history, reporting no incarcerations or problems with the law. Tr. 397. Contrary to what she stated in the function report she had filled out a month before, Plaintiff told Dr. Teixeira that she stopped working in May 2010 due to physical and mental problems, including anger management and panic attacks. Id.

On examination, Plaintiff was depressed but mostly angry; she denied delusions, hallucinations and manic symptoms and reported feeling sad and worthless, lacking energy and the desire to do anything, with poor concentration, sleeping problems and panic attacks. Id. Her insight, judgment and memory all appeared unimpaired, while her abstract reasoning and task persistence appeared adequate. Id. Dr. Teixeira diagnosed depression, a panic disorder with agoraphobia, a cocaine abuse disorder (in remission) and noted the need to rule out a variety of

other possible diagnoses (bipolar disorder, post-traumatic stress disorder, substance induced

mood disorder and nicotine dependence). Tr. 398. She assigned Plaintiff a GAF[2] score of 50.

Id. On December 16, 2010, in reliance on Dr. Teixeira's report, state agency physician Dr.

Stephen Kleinman (apparently a psychiatrist) concluded that Plaintiff's depression and anxiety

were not sufficiently severe as to satisfy any Listing. Tr. 120. Soon after, on January 25, 2011,

Plaintiff's applications were denied initially. Tr. 170.

On reconsideration, in September 2011, Plaintiff underwent a psychological evaluation

conducted by state agency psychologist Dr. Sol Pittenger. Tr. 592-96. During the evaluation,

she was tense and belligerent, displaying pressured and impulsive speech, and was angry and

critical towards Dr. Pittenger. Tr. 592-95. She reported a history of mood instability and

substance abuse, with a recent relapse (cocaine) two weeks previously and heavy drinking for the

last five months; she denied ever having had substance abuse treatment. Id. She described

disturbed sleep, limited social interaction due to anger and irritability, limited contact with her

children, physical abuse in childhood and in adult relationships, flashbacks, occasional

nightmares and panic attacks, shortness of breath, vomiting and sweating. Id. She had married

recently and was able to drive independently, but did no chores due to pain. Tr. 594. Despite

this history, she reported sporadic involvement with mental health treatment. Tr. 593. Dr.

Pittenger found her to be of average intelligence, with intact memory, recall and concentration,

---

[2] GAF refers to a Global Assessment of Functioning ("GAF") score. The GAF scores relevant to this case are in the 41–50 range, which indicates "serious impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")). In response, the Social Security Administration ("SSA") released an Administrative Message (AM–13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders." It makes clear that adjudicators may continue to receive and consider GAF scores. See SSA Admin Message at 2-6.

and an intact fund of information, but poor insight and fair to poor judgment.  Tr. 595.  His diagnoses included alcohol abuse, a history of cocaine abuse, bipolar II disorder, and post-traumatic stress disorder; he assigned a GAF score of 46.[3]  Tr. 596.

Later in September 2011, state agency psychologist Dr. J. Litchman reviewed the file, which by then included records of Plaintiff's primary care team at Family Care Center, of the counselor at Gateway, and of the emergency department staff at Milford, Memorial and Miriam Hospitals, in addition to the records reflecting Plaintiff's confrontations with various health providers.  See, e.g., Tr. 378 (Plaintiff yells at Center for Orthopaedics because staff insist on co-pay); Tr. 436 (Plaintiff uses profanity when told she is not cleared to return to work).  Dr. Litchman first examined the equivalence of Plaintiff's impairments to a Listing, focusing on Listing 12.04 (Affective Disorders) and Listing 12.06 (Anxiety-Related Disorder); he found that her restrictions of activities of daily living and her difficulties in social functioning and concentration, persistence or pace are all moderate and noted the absence of any episodes of decompensation.  Tr. 146.  He also prepared an assessment of Plaintiff's mental residual functional capacity ("RFC").  Reconsideration was denied on October 3, 2011.  Tr. 176.

Dr. Steven Kaplan testified as a medical expert at Plaintiff's hearing regarding her physical ailments.  Tr. 46-82.  However, he made clear that he is not a psychiatrist and was unable to comment on her mental health other than to mention her diagnoses.  Tr. 59.  Plaintiff did not offer any opinion evidence; accordingly, no qualified professional opined to limitations – either mental or physical – sufficiently severe as to support a finding of disability.  Tr. 25.

## II.    Travel of the Case

On October 7, 2010, Plaintiff filed her DIB and SSI applications.  Tr. 246, 250.  Both were denied initially, on January 25, 2011, and on reconsideration, on October 3, 2011, after

---

[3] See n.2, supra.

which Plaintiff requested a *de novo* hearing before an Administrative Law Judge. Tr. 182. It was held on August 7, 2012. Tr. 35. On October 19, 2012, the ALJ decided that Plaintiff was not disabled. Tr. 27. Plaintiff requested timely review of the ALJ's decision to the Appeals Council on November 16, 2012. Tr. 11. On November 5, 2013, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the Commissioner's final decision. Tr. 5. Plaintiff timely filed this action.

## III.   The ALJ's Hearing and Decision

At the August 7, 2012, hearing, Plaintiff was represented by counsel. She appeared and testified, as did Dr. Kaplan, the medical expert, and the vocational expert. Tr. 35-113.

Plaintiff testified that she was homeless, "so I just live wherever I can stay," generally alternating between her mother and her ex-boyfriend. Tr. 82. She stopped working because she was falling, could not hold up her work equipment and could not drive her work truck and does not live with her children because she cannot care for them. Tr. 86-87, 88. In addition to physical issues, Plaintiff testified that she cannot work because she has trouble getting along with others and would flip out, screaming and throwing things at the employees she supervised; despite this behavior, she also testified that she got away with it because she was one of the better technicians. Tr. 97-98. She prefers to be by herself and does not believe that medication or treatment has helped her get along with others, although medication "calms me down a little." Tr. 97-99. She claimed that she has tried twice to run over her husband – despite this, Plaintiff believes that he still loves her and testified that he was waiting for her outside the hearing. Tr. 102. When the ALJ questioned her about the lack of almost any mental health treatment except for a handful of appointments at Gateway, Plaintiff testified that she was getting counseling at Gateway and medical treatment from psychiatrist Dr. Kroessler; as a result of this testimony,

both her attorney and the ALJ realized that there were records missing. Tr. 93. Representing that this would be "probably a significant amount of records," her attorney promised to supplement the record. He asked the ALJ to suspend the hearing until Dr. Kroessler's treating records and the most recent Gateway records were obtained and to resume with a psychiatric or psychological expert to opine on whether Plaintiff's mental impairments meet or equal the criteria of any Listing. Tr. 93-95.

At the end of the hearing, the ALJ took Plaintiff's request for a supplemental hearing with a psychiatric or psychological expert under advisement, with the determination to be made after the Kroessler/Gateway records were received. Tr. 111-12. The records were subsequently produced and accepted; however, they were neither voluminous nor supportive of seriously debilitating mental health limitations. Tr. 15; see Tr. 971-96. To the contrary, Dr. Kroessler's notes state, "not disabled," Tr. 992, while the Gateway counselor recorded that Plaintiff was participating well in counseling with no imminent risk factors, including no depression, anxiety, psychosis, mania or suicidal or homicidal ideation. Tr. 977, 987, 990. Based on his review of these records, the ALJ concluded that the new evidence did not affect the state agency finding that Plaintiff's impairments are not equivalent in severity to any Listing; as a result, he did not hold a supplemental hearing or call a psychiatric or psychological expert. Tr. 19 n.1.

In his decision, the ALJ found that Plaintiff remains insured through December 31, 2015. Tr. 17. At Step One of the sequential evaluation process, he concluded that Plaintiff had engaged in substantial gainful activity from October 2009 through May 2010, but not thereafter. Tr. 18. At Step Two, the ALJ found that Plaintiff had established the medically determinable impairments of cervical degenerative disc disease status post fusion surgery, lumbar degenerative disc disease, depressive disorder, anxiety disorder and alcohol abuse. Tr. 18-19. At Step Three,

his analysis resulted in the finding that none of these impairments, alone or in combination, met or medically equaled any Listing in severity. Tr. 19-20.

At Step Four, based on consideration of the entire record, the ALJ made his RFC finding, relying not only on the medical evidence, including the opinion evidence of the state agency experts, to which he accorded significant probative value, but also on his well-supported finding that the many inconsistencies in Plaintiff's testimony and statements to medical providers raised concerns about her credibility. Tr. 20-25. The ALJ held that Plaintiff could not perform any of her past relevant work. Tr. 25. At Step Five, in reliance on testimony from a vocational expert, he found that Plaintiff could perform sedentary and light jobs that existed in significant numbers. Tr. 26-27. Accordingly, he found that Plaintiff has not been disabled at any relevant time and denied her applications. Tr. 27. Because of his finding of no disability, the ALJ did not engage in an examination of the potential materiality of the record references to drug and alcohol use. See SSR 13-2p, 2013 WL 621536, at *10 (Feb. 20, 2013).

## IV.    Issues Presented

Plaintiff's motion for reversal rests on two arguments. First, she contends that the ALJ committed reversible error at Step Three by failing to obtain an updated psychiatric/ psychological medical expert opinion to evaluate medical equivalency to any Listing based on the Gateway/Kroessler records produced after the hearing closed. Second, she argues that the ALJ's conclusion at Step Three that Plaintiff's mental impairments result in only moderate limitations was erroneously based on a misrepresentation of the facts.

## V.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that

the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is

new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) there is

good cause for failure to submit the evidence at the administrative level.  See Evangelista v.

Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).  With a Sentence Six

remand, the parties must return to the Court to file modified findings of fact.  Jackson, 99 F.3d at

1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction and

does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe,

making the claimant unable to do previous work, or any other substantial gainful activity which

exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a

treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F.

Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable

clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial

evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L,

2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may

discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity, see 20 C.F.R. §

404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

**B.      The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits. 42 U.S.C. § 416(i)(3); Deblois, 686 F.2d at 79. If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### C. Evaluation of Mental Illness Claims

The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique that assesses impairment in four work-related functions: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The review technique is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process, and also serves as the backdrop for the more detailed mental RFC assessment at Step Four. See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 371184 (July 2, 1996). The ALJ must incorporate pertinent findings and conclusions based on the technique into his decision and must include a specific finding as to the degree of limitation in each of the four functional areas. 20 C.F.R. § 404.1520a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure in Federal Court § 5:38 (2014).

### VII. Application and Analysis

### A. Psychiatric/Psychological Expert

At Step Three, an impairment "medically equals" a listing if "it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The ALJ is responsible for determining whether an impairment medically equals a listed impairment. Social Security Ruling 96–6p, 1996 WL 374180, at *3 (July 2, 1996) ("SSR 96-6p"). According

to SSR 96-6p, "longstanding policy" requires the ALJ to obtain evidence from a state agency physician or psychologist on the issue of equivalence and to assign that expert opinion evidence appropriate weight.  Id.  Further, if new evidence is submitted after the expert opinion is received, the ALJ "must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence . . . in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  Id. at *3-4.  During the hearing in this case, Plaintiff invoked SSR 96-6p.  Unaware of the content of the not-yet-produced Gateway counseling records and Dr. Kroessler's psychiatric treatment records, Plaintiff asked the ALJ to suspend the proceedings until the records were produced and to resume with the assistance of an expert able to explain the impact of the new records on the Step Three finding of state agency psychologist Dr. Litchman that Plaintiff's mental impairments are not medically equivalent in severity to the requirements for a Listing.  Tr. 19, 94-96.

When they were produced, however, far from evidencing "B" or "C" criteria limitations[4] more severe than the limitations reflected in the records reviewed by Dr. Litchman,[5] the new

---

[4] Plaintiff argues that she meets the Listing criteria for affective disorder (12.04), anxiety disorder (12.06) or personality disorder (12.08).  To sustain her burden for all three, Plaintiff must present evidence of the "B" criteria, which is evidence showing that she has at least two of:

- "marked" restriction of activities of daily living;
- "marked" difficulties in maintaining social functioning;
- "marked" difficulties maintaining concentration, persistence, or pace; or
- repeated episodes of decompensation, each of extended duration.

Listing 12.04B, Listing 12.06B, Listing 12.08B, 20 C.F.R. Part 404, Subpart P, Appendix 1.  Alternatively, Listing 12.04 can be met by showing the existence of the "C" criteria, which is the medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

- repeated episodes of decompensation, each of extended duration;

records reveal an apparent improvement in Plaintiff's condition as a result of sustained treatment by a psychiatrist. By her third appointment, one month into treatment with Dr. Kroessler, she was feeling better, with good sleep and energy, increased motivation, less avoidance and fewer racing thoughts, while by the fifth appointment, Dr. Kroessler's notes indicate that she is "not disabled." Tr. 992, 994. Similarly, the new Gateway counseling records consistently reflect that Plaintiff was participating well in counseling, with no imminent risk factors, including no depression, anxiety, psychosis, mania or suicidal or homicidal ideation. Tr. 971-90. The only potentially material difference between the new records and those reviewed by Dr. Litchman is Dr. Kroessler's opinion that a diagnosis of intermittent explosive disorder with histrionic personality disorder should be considered, introducing the possibility of personality disorder for the first time. Tr. 995-96. However, as with the Listings specifically considered by Dr. Litchman (12.04/Affective Disorder and 12.06/Anxiety Disorder), to meet the Listing for personality disorder (12.08), there must be evidence of episodes of decompensation or a greater degree of severity with respect to the "B" criteria than the "moderate" findings made by Dr. Litchman. Neither Dr. Kroessler nor the Gateway counselor mentions any observations that

---

- residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
- current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.04B, 20 C.F.R. Part 404, Subpart P, Appendix 1. Similarly, Listing 12.06 can be met by showing the existence of "C" criteria, which is the existence of an anxiety disorder "[r]esulting in complete inability to function independently outside the area of one's home." Listing 12.06B, 20 C.F.R. Part 404, Subpart P, Appendix 1. There are no "C" criteria for Listing 12.08.

[5] The mental health records in the file on which Dr. Litchman based his findings include the two examining reports of the state agency psychologists, Drs. Teixeira and Pittenger, six pages of treating records from Gateway, the emergency department notes from Memorial Hospital, where Plaintiff sought treatment for suicidal and homicidal ideation, and the extensive treating notes of various physicians at Family Care Center. While none of the Family Care Center providers are psychologists or psychiatrists, they diagnosed and treated Plaintiff's mental health, as well as her physical ailments. Tr. 155-56; 417-23; 592-97. In addition, Dr. Litchman examined the many record references to Plaintiff's eruptions of anger, irritability and impulsiveness. See, e.g., Tr. 378, 612-13. Based on all of this material, he concluded that Plaintiff suffers from "moderate" levels of impairment in the "B" criteria, with no episodes of decompensation; he also found no evidence of the presence of the relevant "C" criteria. Tr. 146.

might demonstrate marked (rather than moderate) restrictions in activities of daily living or marked (rather than moderate) difficulties in social functioning or in concentration, persistence or pace. Further, there is nothing in these records suggesting that Plaintiff has experienced any episodes of decompensation.

Notwithstanding the lack of any evidence in these records suggesting that Plaintiff's impairments are either worsening or more severe than her prior records established, post-hearing, Plaintiff renewed her request for a psychiatric medical expert, Tr. 350-51, relying on the language of SSR 96-6p, which states that an ALJ "must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p, 1996 WL 374180, at *3-4 (July 2, 1996). Plaintiff now argues that the ALJ's denial of this request (Tr. 19 n.1) was error.

I disagree. Plaintiff bears the burden of showing that her impairment meets or equals a Listing. Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989). Despite her burden at Step Three, Plaintiff did not submit any medical expert opinion supporting her claim of equivalence, from which the ALJ was entitled to "draw a negative inference." Canales ex. rel Pagan v. Astrue, Case No. 07–474–ML, 2009 WL 2059716, at *6 (D.R.I. July 13, 2009); see Jones v. Astrue, No. 3:08cv00224, 2009 WL 2827942, at *13 (S.D. Ohio Sept. 1, 2009) (no error at Step Three where claimant "failed to bring [to the ALJ's attention] evidence of claimed equivalency," such as opinion from a "treating physician directly equating her impairment to one" under a listing). Critically, Plaintiff points to nothing, and the ALJ found nothing, in the new records that might lead to reconsideration of Dr. Litchman's well-supported findings on the

"B" and "C" criteria.  See Skellie v. Colvin, No. 14-CV-00010-PB, 2015 WL 858357, at *5

(D.N.H. Feb. 27, 2015) (no error in not updating expert opinions where claimant does not

identify a single piece of evidence in newly submitted records that undermines opinions);

McCallister v. Barnhart, No. 03-189-P-S, 2004 WL 1918724, at *7 (D. Me. Aug. 26, 2004) (no

error in ALJ's failure to obtain updated medical-expert opinion on Listing equivalence despite

new medical evidence because new evidence does not demonstrate material worsening of

condition).

I find that the ALJ committed no error in his conclusion that the new evidence does not

change Dr. Litchman's findings.  Accordingly, I find that the ALJ's decision not to receive

additional medical evidence in the form of testimony or an opinion from a psychiatric or

psychological expert is not legal error, but is consistent with the requirements of SSR 96-6p.

See Skellie, 2015 WL 858357, at *4-5; McCallister, 2004 WL 1918724, at *7.

### B.     Factual Errors in ALJ's Evaluation of Social Functioning and Concentration, Persistence and Pace

Plaintiff's second attack is leveled at certain of the factual observations deployed by the

ALJ in support of his Step Three findings that Plaintiff suffered only moderate difficulties in

social functioning and in concentration, persistence and pace.  Tr. 20.  In challenging the social

functioning finding, Plaintiff alleges that the ALJ committed material error in his reliance on the

following set of facts:

> Although the claimant reported difficulty getting along with others and indicating
> that she had episodes of anger and road rage, the claimant did not report any legal
> issues or episodes of physical conflict.  She does have a circle of friends and
> family with whom she is able to live.  She was able to establish rapport with a
> variety of treating sources.

Tr. 20. In challenging the finding with respect to concentration, persistence and pace, Plaintiff contends that the ALJ relied only on raw test results and ignored Dr. Teixeira's conclusion that Plaintiff's "attention and concentration appeared poor." Tr. 20, 397.

In the first place, both arguments founder because the ALJ relied on the opinion of a qualified psychologist, Dr. Litchman, who had been "designated by the Commissioner on the issue of equivalence." SSR 96-6p, 1996 WL 374180, at *3. In accordance with the requirement of SSR 96-6p that expert opinion evidence must be received and afforded appropriate weight, id. at *2, the ALJ rested his Step Three findings not solely on his own interpretation of raw facts or raw testing results, as Plaintiff alleges, but rather accorded significant probative weight to Dr. Litchman's expert opinion and properly relied on it. It was Dr. Litchman who interpreted the raw facts and testing results that bear on Plaintiff's social functioning and concentration, persistence and pace. See id. at *2-3. Plaintiff's only critique of the Litchman opinion is that it was formed before production of the new Gateway and Kroessler records; however, as noted, these records do not impact the opinion's reliability because they collectively reflect only Plaintiff's improvement with treatment. Otherwise, Plaintiff points to nothing about Dr. Litchman's analysis that renders the ALJ's reliance on it error. Hall v. Colvin, 18 F. Supp. 3d 144, 155 (D.R.I. 2014) (no error in reliance on state agency consultant's opinion properly based on record review) (quoting SSR 96-6p); see Bourinot v. Colvin, No. CIV.A. 14-40016-TSH, 2015 WL 1456183, at *15 (D. Mass. Mar. 30, 2015) (assessment of non-examining medical advisor may constitute substantial evidence to support finding of non-disability).

Plaintiff's contention that the ALJ made factual errors also collapses upon careful review of the record evidence bearing on each of the challenged facts.

First, Plaintiff takes umbrage with the ALJ's observation that "claimant did not report any legal issues or episodes of physical conflict."  Plaintiff is right that the record is replete with evidence that she thought of hurting others and often threatened people, including self-reported incidents of road rage, Tr. 101, chasing her children's father with a knife, Tr. 403, throwing wrenches at co-workers, Tr. 92, and almost running over her husband with the car, Tr. 102.  However, the ALJ got it right – in no instance did Plaintiff report that her threats ripened into outright physical conflict.  This absence of evidence that her threats ripened into physical conflict is confirmed by the complete lack of any criminal charges, convictions, arrests or medical treatment for injuries caused by physical conflict.  Further, whatever Plaintiff may have done to the father of her children, he continued to allow her to live in his basement; in the clinical interview with Dr. Teixeira and at the hearing, she reported that she was currently living there.  Tr. 82, 102, 396.  Similarly, in the same breath with the disclosure of throwing wrenches at other workers, Plaintiff also testified that her outbursts were overlooked because she was one of the better technicians; moreover, she "still got good references from" her employers."  Tr. 97-98, 107.  Finally, despite "[t]rying to run him down in [her] car," Plaintiff testified that her husband "still loves me.  He's outside [the hearing room] waiting for me."  Tr. 102.

Equally well supported is the ALJ's factual statement that Plaintiff has a circle of family and friends with whom she is able to live.  While Plaintiff is right that she testified she had no home of her own at the time of the hearing, Tr. 82, and "just . . . can't live with anybody," Tr. 102, there is no evidence that she is living on the streets or in shelters.  Rather, she likes to live with her mother, Tr. 89-90 ("she did everything for me"), and was able to stay in the basement of her ex-boyfriend, and at times with her husband, with her friend Eddie and with her grandmother.  Tr. 82.  There is a single record reference to an occasion when she and her

husband signed up for a shelter, but did not stay and ended up in the car. Tr. 83. The isolated nature of this incident illustrates the point – whatever her social functioning limitations, the record establishes that Plaintiff has built a network of family and friends willing to take her in.

Finally, the ALJ's conclusion that "she was able to establish rapport with a variety of treating sources" is consistent with the record, which makes clear that, while she certainly clashed with some treating sources, she developed and maintained a rapport with others. Tr. 20. For example, her Center for Orthopaedics record includes a handwritten note indicating that Plaintiff was yelling at staff, yet two different counselors at Gateway consistently noted she "is a cooperative client" and that "client participated well in the counseling session." Tr. 420, 990. Similarly, while the consultative examination with Dr. Pittenger reflects that she was "angry and repeatedly critical including towards this writer, regarding the evaluation process and towards many other individuals in her life," the other state agency examining psychologist, Dr. Teixeira, reported that she was able to develop an "adequate" rapport. Tr. 395, 592. Further, while once during treatment at the Family Care Center, Plaintiff had to be walked to her car after she became angry, none of her many other encounters with providers at Family Care Center ever erupted in that way. Compare Tr. 762, with Tr. 424-591, 736-810.

Plaintiff's final attack is on the ALJ's factual support for his "B" criteria finding that her difficulties of concentration, persistence and pace are moderate, based on the test results in the reports of Drs. Teixeira and Pittenger. She claims that Dr. Teixeira's notation that Plaintiff's "attention and concentration appeared poor" must trump all other record evidence and compel the conclusion that she has marked – not moderate – difficulties of concentration, persistence and pace. Tr. 397. This argument overlooks the review of Dr. Teixeira's entire report, including the results of her testing, by two state agency psychologists, Dr. Kleinman and Dr. Litchman, both of

whom concluded that the Plaintiff's difficulties in concentration, persistence and pace were not marked. Tr. 120, 146. Indeed, Dr. Kleinman specifically wrote: "Dr. Teixeira's report does not establish severe Part B [psychiatric review technique] limit." Tr. 120. Plaintiff's argument also ignores Dr. Teixeira's observation that Plaintiff's persistence and pace were adequate and regular, Tr. 398, as well as Dr. Pittenger's conclusion that "[c]oncentration is intact." Tr. 594-95. Other evidence in the record is consistent with the ALJ's finding that Plaintiff does not suffer from significantly impaired concentration on a sustained basis, despite her complaints of concentration problems. See, e.g., Tr. 422 (Gateway screening form does not indicate difficulty concentrating); Tr. 963 (Dr. Handel's treating note states "attention span, concentration; unremarkable").

In sum, having reviewed the entire record, I find no misrepresentation of fact and no error underpinning the ALJ's Step Three findings that Plaintiff's social functioning and concentration, persistence and pace are moderately impaired. The ALJ's findings are well supported by the substantial evidence in the record and should be sustained.

## VIII. <u>Conclusion</u>

I recommend that Plaintiff's Motion to Reverse without or, Alternatively, with a Remand for a Rehearing of the Commissioner's Final Decision (ECF No. 7) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 9) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008);

Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
April 30, 2015